Lorraine I. BILLS, Plaintiff–Appellant,

v.

Dennis W. ASELTINE, et al., Defendants–Appellees.

No. 91–1369.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 10, 1992.

Decided March 9, 1992.

---

Robert J. Dinges (argued and briefed), Robert J. Dinges & Associates, Detroit, Mich., for plaintiff-appellant.

Dennis J. Clark (argued and briefed), Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich.; Thomas P. Vincent, Plunkett & Cooney; Frank J. Monticello (argued), Office of Atty. Gen., Appellate Div., Margaret A. Nelson (briefed), and Mark W. Matus, Office of the Atty. Gen., Tort Defense Div., Lansing, Mich., for defendants-appellees.

---

* Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Before MILBURN and NELSON, Circuit Judges, and HOOD, District Judge.*

MILBURN, Circuit Judge.

Plaintiff Lorraine I. Bills appeals from the district court's grant of summary judgment in favor of defendant police officers and certain municipalities within the state of Michigan. There are numerous issues in this case arising out of the execution of three search warrants at plaintiff's residence. The principal issues in this case are (1) whether police exceeded the scope of the search warrants they were executing, (2) whether the presence of private citizens at the searches rendered the searches unconstitutional, (3) whether the photography of objects by police officers within the searched premises was constitutional, (4) whether the last search warrant was tainted by a previous unconstitutional search, (5) whether the district court applied the proper standards for determining qualified immunity and municipal liability, and (6) whether the district court properly dismissed plaintiff's claim of violations of her rights under the Michigan Constitution. For the reasons that follow, we affirm in part and reverse in part.

I.

Plaintiff Lorraine Bills, her husband, Dennis Bills, and her two sons, Charles and Howard Sutton, resided at 5401 West M–36, Pinckney, Michigan. On August 20, 1987, defendant Dennis Aseltine, a police sergeant of the Village of Pinckney Police Department, obtained information from an informant that a stolen Kubota generator could be found at the Bills' residence and that a large number of General Motors parts and tools were also located there. Although Sergeant Aseltine knew that both Dennis and Lorraine Bills worked at the General Motors Proving Grounds in Milford, Michigan, and that the General Motors parts and tools described by the infor-

mant might be stolen, he obtained a search warrant only for the Kubota generator.

The warrant authorized the search of the Bills' ranch-type house, its attached garage, and a shed attached to the back of the garage. Before executing this warrant, Sergeant Aseltine contacted William Meisling, a security officer at General Motors, and invited him to accompany the police in their execution of the search warrant in the hope that Meisling could identify stolen General Motors property in the Bills' residence. Sergeant Aseltine also obtained the assistance of Larry Owen, police chief of the Unidella Township Police Department, Officers Gawron and Medbury of the Hamburg Township Police Department, Deputy John Haischer of the Livingston County Sheriff's Department, and Officers Brian DeNoyer, Jeffrey Ewald, and Rick Davis, all, like Aseltine, officers of the Pinckney Police Department.

At approximately 8:15 p.m. on August 20, 1987, the police officers sought admittance to the Bills' residence. Charles Sutton, plaintiff's son, answered the door and admitted the police. The search warrant was served on Sutton, who led Sergeant Aseltine to the stolen Kubota generator located in the shed attached to the garage while other officers conducted a sweep of the house. Near the Kubota generator, the police officers observed a Yamaha generator with its serial numbers in plain view. A check of police records revealed the Yamaha generator to be stolen as well, and Officer Gawron was dispatched to obtain a warrant for its seizure.

In the meantime, Officer Haischer and Chief Owen had noticed a large marijuana plant growing in the kitchen of the residence. After Sutton admitted the plant belonged to him, Officer Haischer seized the plant and removed it to his patrol car.

Shortly after the Kubota generator was located and seized, William Meisling, the General Motors security officer, arrived. A group of officers, including Sergeant Aseltine and Meisling, then entered plaintiff's home where they found quantities of what appeared to be General Motors parts and equipment stacked in the basement.

The officers found quantities of General Motors parts and equipment, particularly shock absorbers, in a large crawl space about four feet high beneath the house. Meisling took 231 photographs of the parts and equipment without physically disturbing any of it. This activity occurred while officers remained on the premises awaiting the return of Officer Gawron with the warrant for the Yamaha generator.

Charles Sutton had been arrested, handcuffed, and placed in a police vehicle soon after the first stolen generator was located. His mentally retarded brother, Howard Sutton, was found within the house and was turned over to neighbors for safekeeping. Neither plaintiff Lorraine T. Bills nor her husband was present during the search.

On August 21, 1987, William Meisling contacted the Michigan State Police to seek assistance in recovering what he believed to be the stolen General Motors property he had seen within the Bills' residence on the previous day. Trooper Darnell Seering, a friend of Meisling's, was assigned the investigation. Meisling and Seering went to the Livingston County Prosecutor's Office where Assistant Prosecutor Thomas Bahen prepared an affidavit for a search warrant based on Meisling's observations. In this affidavit, Meisling related how Sergeant Aseltine had invited him to accompany the police on the previous day's search of the Bills' residence and recounted how he had observed and photographed a large quantity of parts and equipment belonging to General Motors.

Trooper Seering had not been present at the previous search of the Bills' residence, and he did not review the affidavit prepared by Bahen for Meisling. On the basis of that affidavit, a search warrant was duly issued, and on that same day, August 21, 1987, at approximately 7:00 p.m., Trooper Seering and two local police officers, accompanied by Meisling and two other General Motors employees, executed the warrant by seizing five fire extinguishers, seventy-six shock absorbers, an air drill, two alternators, a flare kit, an electric im-

pact wrench, and several pieces of metal bar stock.

Dennis Bills was subsequently charged with receiving and concealing stolen General Motors property in violation of Michigan Compiled Laws § 750.535, but on January 20, 1989, the Livingston County Circuit Court · suppressed from evidence all the General Motors property taken from the Bills' residence on August ·21, 1987. It took this action because it believed that the search on August 20, 1987, was overly broad and tainted Seering's search on the following day.

The sole plaintiff in this·case is Lorraine I. Bills, who filed this action on August 28, 1989, seeking damages against the various police officers and their agencies. In her complaint, plaintiff sought to recover, pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, for alleged violations of her rights secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Additionally, the complaint contained pendent state claims for trespass, negligent or intentional infliction of emotional distress, and violations of the Michigan Constitution.

All defendants filed motions for summary judgment. The district court granted these motions by order dated February 6, 1991, and this timely appeal followed.[1]

## II.

## A.

This court reviews a district court's grant of summary judgment de novo, viewing all the facts and inferences flowing therefrom in the light most favorable to the nonmoving party. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). When a motion for summary judgment is filed, the moving party carries the burden of showing that no genuine issue of material fact exists. In the face of a summary

judgment motion, however, the nonmoving party may not rest on its pleadings, but must come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *60 Ivy St. Corp. v. Alexander,* 822 F.2d ·1432, 1435 (6th Cir.1987).

· "By its very terms, the standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute between the parties must be genuine, and the facts must be such that, if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. *60 Ivy St. Corp.,* 822 F.2d at 1435. If the disputed evidence "is merely colorable ... or not significantly probative ... summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

## B.

▮ Plaintiff argues that defendants violated her Fourth Amendment rights when they searched her home on August 20, 1987. In support of this contention, plaintiff makes two arguments. First, she argues that the police entry and seizure of her house was unnecessary because her son, Charles Sutton, led officers directly to the Kubota generator in the shed attached to the garage. This argument ignores the fact that the warrant in question indisputably authorized a search of the house, and an "initial team" had been assigned to enter the living quarters for the purposes of securing them during the course of the search. The district court found that "the officers entered the home on the authority

---

1. General Motors Corporation and William Meisling, although originally named as defendants in this action, entered into a settlement agreement with plaintiff and were dismissed from this action on August 16, 1990. On August

2, 1991, this court dismissed plaintiff's appeal as to Livingston County, Livingston County Sheriff's Department and Deputy John Haischer based on a settlement and stipulation for dismissal in the district court.

of the search warrant, *before* the generator had been located...." J.A. 33 (emphasis added). The record supports this interpretation of events.

Plaintiff's second argument has to do with the presence of William Meisling, the General Motors security officer who entered plaintiff's home and property at the invitation of Sergeant Aseltine of the Pinckney Police Department. In the company and under the supervision of Sergeant Aseltine, Meisling moved through the garage, the shed, and most of the areas of the home, including the basement and the crawl space, taking 231 photographs of items he believed might belong to General Motors. It is undisputed that Aseltine personally invited Meisling to attend the execution of the search warrant on August 20, 1987, and that he did so because he thought Meisling might be able to recognize some stolen General Motors property in plain view if he could enter the premises. Sergeant Aseltine stated in his deposition that he did not invite Meisling along because he thought Meisling could assist or be helpful with respect to the search for the Kubota generator. He also stated that he had consulted no one before inviting Meisling, and that he had recovered the generator, which was the sole target for the search warrant, *before* Meisling arrived at plaintiff's home. It is therefore undisputed that Meisling was not on the premises for the purpose of the search warrant, and, in fact, the search authorized by the warrant was completed before Meisling arrived. Plaintiff argues that Meisling's presence and photographic activities were unreasonable.

■ The district court rejected this argument in reliance on *United States v. Clouston*, 623 F.2d 485 (6th Cir.1980) (per curiam). In *Clouston*, federal officers had been issued a warrant to search for and seize certain electronic devices useful for the surreptitious interception of wire communications in violation of federal laws. The federal agents invited two security officers from the local telephone company to accompany them in the execution of the warrant in order to identify telephone company equipment. The district court suppressed all the fruits of the search—both the unlawful devices and telephone equipment—and this court reversed, relying primarily on 18 U.S.C. § 3105, which provides that search warrants may be served by specified officers and by no other person "except in aid of the officer on his requiring it, he being present and acting in its execution."

*Clouston* is distinguishable from this case in at least two respects. First, 18 U.S.C. § 3105 applies only to searches executed by federal officers. The search in this case was by state officers. Second, in *Clouston* we found it to be

> clear that the telephone company employees were present on the premises *in aid of the officers* who were authorized to conduct a search for electronic devices, that they were there at the request of the officers and that the officers were present and acting in the execution of the warrant.

*Id.* at 486–87 (emphasis added). Thus, in *Clouston*, the telephone company employees assisted federal officers in identifying electronic devices having to do with the interception of telephone communications and were present in "aid of the officers ... in execution of the warrant." By contrast, in the present case, Meisling was present, not in aid of the officers or their mission, but for his own purposes involving the recovery of stolen General Motors property not mentioned in any warrant. Moreover, the execution of the first warrant was complete by the time Meisling arrived at plaintiff's home. Therefore, it cannot be maintained that the officers were acting "in execution of the warrant" at the time Meisling was permitted to "tour" the premises. Indeed, the facts show that the officers' continuing presence at the scene was for the purpose of securing it while Officer Gawron obtained a second warrant to authorize the seizure of the Yamaha generator. Thus, the district court's reliance on *Clouston* in this case is misplaced because 18 U.S.C. § 3105 does not apply to state searches and because Meisling was acting for his own purposes rather than any purpose of the officers in the execution of their warrant.

A case more on point, although not directly so, is *United States v. Sanchez*, 509 F.2d 886 (6th Cir.1975). In *Sanchez*, state officers with a warrant to search for narcotics learned that there might also be explosives on the premises they intended to search. They called a special agent of the Bureau of Alcohol, Tobacco and Firearms ("A.T.F.") to assist them in the search as an expert in explosives. The search turned up no narcotics, but the A.T.F. agent discovered in plain view two containers containing seventy pounds of explosives.

In response to defendant's motion to suppress, the government defended its evidence on the grounds that its agent was properly on the premises because he had accompanied local police at their request and entered under a valid search warrant. This court rejected that argument.

> We find this argument unpersuasive. We believe that the warrant authorized only the local officers to enter and search the Sanchez property for narcotics. It could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a second warrant to search for different items of property.

*Id.* at 889. The basis of the court's holding was that the A.T.F. agent had two hours within which he could have obtained his own search warrant to search for explosives and that his failure to obtain a warrant under those circumstances rendered his presence in the Sanchez home unconstitutional. In its analysis, this court viewed the case as one of multiple intrusions.

> On the facts of this case, there were two simultaneous but distinct intrusions, each conducted by separate agencies for the purpose of securing different types of property. Each search had to be authorized independently by a separate warrant unless the warrant requirement was excused by a valid exception.

*Id.* at 889. This court also recognized that "the crucial issue presented by this case [was] whether the federal agent had a right to be on the premises...." *Id.* at 890. We found that

> [b]ecause the A.T.F. agent had no right to be on Sanchez premises during the raid, he did not satisfy the threshold requirement of the plain view doctrine and thus his warrantless seizure of the explosives was unconstitutional.

*Id.*

The facts in the present case are somewhat similar to those in *Sanchez*, except that there may be some question as to whether any officer had probable cause to obtain a warrant for the search for General Motors property. Otherwise, the cases are similar in that the federal agent in *Sanchez* was certainly not present to assist local narcotics officers in their search for narcotics—he was searching strictly for explosives. His presence was therefore treated as a separate and distinct intrusion, and this court required a constitutional justification for that intrusion. Finding none, it reversed.

In this case, Meisling obviously had no warrant of his own, and his intrusion was separate and distinct from the police entry because he entered the premises for purposes other than the execution of the search warrant. His entry might have been justified if he had been present to assist the local officers, but Sergeant Aseltine admitted that was not Meisling's purpose. Therefore, Meisling's inspection tour of the innermost parts of plaintiff's home was not authorized by any legal process or any known legal doctrine.

The matter does not end here, however, because the issue in this case is not whether Meisling's photographic tour of the premises, per se, was unconstitutional, nor is the question whether the items he observed should be suppressed. This is a civil action for damages against state police officers and their employers, and the question is whether *those* defendants committed acts that resulted in a constitutionally unreasonable intrusion into plaintiff's residence. It is also important to bear in mind that the rights afforded by the Fourth and Fourteenth Amendments protect citizens only against governmental action. As the Supreme Court stated in *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574,

576, 65 L.Ed. 1048 (1921), the Fourth Amendment "was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies...." Thus, Meisling's inspection tour and photographing of items in plaintiff's home, by itself, while perhaps constituting a trespass, does not offend the Fourth Amendment. The critical question in this case is whether the police officers engaged in any constitutionally unreasonable act in permitting or facilitating Meisling's presence in plaintiff's home.

■ When police obtain a warrant to search the home of a citizen, they concomitantly receive certain limited rights to occupy and control the property. Within the bounds of their warrant, the police may enter the property in question, may search for the items described in their warrant, may detain persons found on the premises during the search, and they may take such reasonable action as is necessary to protect themselves during the execution of the warrant. Together with the right to conduct these activities on a citizen's property goes the obligation to do so in a reasonable manner.

In *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court declared that it was "constitutionally reasonable" for police officers to detain a citizen at his residence while that residence was searched pursuant to a warrant. The Court stated:

> Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause *implicitly* carries with it the *limited* authority to detain the occupants of the premises while a proper search is conducted.

*Id.* at 705, 101 S.Ct. at 2595 (emphasis added). Also, implicit in the authority conferred on police officers by a valid warrant is the authority to secure the premises to be searched in order to minimize the risk of harm to the officers. The Court in *Summers* recognized this in its statement that "[t]he risk of harm to both the police and the occupants is minimized if the officers

routinely exercise *unquestioned command* of the situation." *Id.* at 702–03, 101 S.Ct. at 2594 (emphasis added). Thus, typically, police officers executing search warrants sweep the described premises to determine whether other persons are present and whether the premises are safe before they undertake the exact search specified by their warrant. In *United States v. Elkins*, 732 F.2d 1280, 1285 (6th Cir.1984), for example, this court refused to suppress evidence found in plain view during a "protective sweep" of the premises after the *warrantless* entry of a dwelling was justified by exigent circumstances.

> Once having entered the premises, the agents were then required to secure all persons therein and to make a protective sweep for the weapons Elkins was known to favor, for the safety of all concerned. This was done with *minimal intrusion*, and the agents and occupants waited together in the den from 6:30 to 8:00 p.m. for a search warrant to arrive.

*Id.* (emphasis added). The fact that officers may have a warrant to enter would not make a protective sweep any less necessary or prudent.

■ Therefore, where an intrusion is justified, whether by warrant or by probable cause and exigent circumstances, police are temporarily placed in control of the premises and its occupants. It is as though the premises were given to the officers in trust for such time as may be required to execute their search in safety and then depart. Officers in "unquestioned command" of a dwelling may violate that trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises. The warrant in this case implicitly authorized the police officers to control and secure the premises during their search for a generator. It did not implicitly authorize them to invite a private security officer to tour plaintiff's home for the purpose of finding General Motors property, thereby discovering evidence that might be of some use in a prose-

cution unrelated to that involving the Kubota generator.

■ Thus, the principal question in this case is whether the officers exceeded the scope of their authority under the warrant in inviting Meisling to conduct an inspection of a private dwelling they controlled. In *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir.1989), this court held that questions involving the manner in which a search warrant was executed were questions for the jury in civil actions brought under 42 U.S.C. § 1983. This court recognized that

> the test for the entry itself and all subsequent conduct is whether these are *reasonable*. As the Supreme Court has said, this is the "ultimate standard ... embodied in the Fourth Amendment." *Michigan v. Summers*, 452 U.S. 692, 699–700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981).

*Id.* at 277 (emphasis added). This court then concluded that the district court's directed verdict for the defendants was improper because issues concerning the manner in which the search warrant was executed turned on factual questions that should have been submitted to the jury.

> On the separate question whether the Hills have presented evidence sufficient to raise a jury question as to whether the *manner* in which the warrant was executed was reasonable, ... we conclude that the directed verdict was improper. Under this rubric, therefore, we remand three questions for trial to to a jury: were the officers reasonable in breaking open the front door, in detaining Alicia Hill at gunpoint, and in conducting a search as extensive as this one was?

*Id.*

There are serious issues remaining in this case as to the constitutional reasonableness of the execution of the search warrant. The available evidence seems to show that police actively procured a private person to tour plaintiff's home with a camera for purposes utterly unconnected with the search warrant they had already executed. Whether this breached the trust under which they held the premises in their complete command, or whether, stated another way, this unreasonably exceeded the scope of the warrant, is a question for a jury in this case. Summary judgment should not have been granted.

■ Plaintiff raises other issues in her brief concerning the seizure of a seven foot tall marijuana plant and other loose marijuana found in plain view in her house. Plaintiff's confused arguments seem to insist that it was unreasonable for officers to enter the home because the stolen generator they were looking for was located in the shed. These arguments are meritless because, as earlier stated, officers have the implicit authority under a search warrant to conduct a protective sweep to assure their safety and their control over the premises. Here, the marijuana plant was observed by officers as they stood in the kitchen talking to Charles Sutton. The loose marijuana was discovered in plain view by officers during the protective sweep of the house. It was their duty to seize any obvious contraband coming into their plain view.

### C.

■ The district court granted summary judgment in favor of defendant Darnell Seering, the Michigan State Trooper who participated in the search for General Motors property on August 21, 1987, on the grounds that the record showed him entitled to qualified immunity. Plaintiff argues that Seering could not be entitled to qualified immunity because he must have known that Meisling's presence on the Bills' property the preceding day was unconstitutional and that, even though the magistrate issued a warrant for the seizure of the General Motors property, the warrant was constitutionally defective, based as it was on Meisling's prior unauthorized inspection of the Bills' home.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court established the "objective reasonableness" test for determining qualified immunity. Under the particular facts in this case, that test asks whether "a reasonably well-trained officer would have

known that the search was illegal despite the magistrate's authorization." *United States v. Leon,* 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82 L.Ed.2d 677 (1984).

The record shows that Seering interviewed Meisling on August 21, 1987, before taking him to the county prosecutor who prepared the affidavit for a search warrant. Meisling told Seering, and later the prosecutor, that he had been present in the Bills' home on August 20, 1987, at the invitation of the Pinckney Police Department and that he had seen various pieces of General Motors property while on the premises. Seering stated in his deposition that he believed Meisling must have been lawfully on the Bills' premises because "[h]e went there in the execution of a search warrant and was invited along." J.A. 384.

An objectively reasonable police officer in Seering's position would not have thought it necessary to conduct a personal analysis of the legality of Meisling's presence at the Bills' premises on the preceding day, particularly so since Meisling's affidavit was approved by the county prosecutor and a search warrant was duly issued by the magistrate. However, had Seering indulged in such an analysis, he might well have concluded that Meisling's plain view observations on the Bills' premises were, at most, a "private search" and that there was no *constitutional* infirmity in the manner in which Meisling acquired his information. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Barry,* 673 F.2d 912, 915 (6th Cir.), *cert. denied,* 459 U.S. 927, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982). The law in that regard is "clearly established."

As to whether Seering had any obligation to conduct a further analysis of Meisling's statement that he participated in the previous search because he was invited to by the Pinckney Police Department, it is highly doubtful that a reasonably well-trained officer would have pressed Meisling with fine questions to determine whether Meisling joined the search party to assist the execution of the warrant or for unrelated purposes of his own. In any event, Seering's deposition indicates that Meisling told him only that he had been present to assist in the execution of a search warrant, and it was objectively reasonable for Seering to accept that explanation. It follows that an objectively reasonable officer in Seering's position would have suspected no infirmity in the manner by which Meisling obtained his information concerning the presence of General Motors property on the Bills' premises, and, therefore, the district court was correct in concluding that Seering was shielded from liability by the doctrine of qualified immunity.

■ Plaintiff also argues that Seering improperly allowed Meisling and two other General Motors security officers to assist him in the execution of the search for General Motors property on August 21, 1987. The General Motors personnel were present for the purpose of assisting Seering in the identification of the property described in the search warrant. This factor distinguishes this situation from the situation obtaining on August 20, 1987, when Meisling was present, but not for the purpose of assisting the police in the execution of their warrant. Police may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant, and not for some other purpose, the bounds of reasonableness have not been overstepped. *See United States v. Clouston,* 623 F.2d 485 (6th Cir. 1980).

■ Plaintiff also argues that Seering seized items not described in the warrant he was executing and states that "there was no valid reason to omit those items on the warrant request." Brief of Appellant at 35. Plaintiff does not bother to specify the items seized which allegedly were not mentioned in the search warrant, nor does she advise this court of the circumstances of their seizure. The district court found that "the additional items were also believed to be stolen GM property and were properly seized," a conclusion supported by the record, which indicates that Seering seized such "additional items" as Meisling could identify as stolen General Motors

property. This was justified under the plain view doctrine of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

### D.

Plaintiff argues that Meisling, Sergeant Aseltine, and Officer Gawron took photographs of the Bills' premises on August 20, 1987, and that the photographs themselves constituted a warrantless search and seizure. The district court held that "[p]hotographing these items in 'plain view' was not a seizure."

█ There are two distinct sets of photographs to be dealt with in this analysis. One set was taken by Meisling and consisted of 231 photographs of parts and equipment thought to be the property of General Motors. The other set of photographs was taken by police officers who recorded various things they saw, including guns in a gun cabinet, the marijuana plant, and automotive parts and equipment. With respect to photographs taken by police officers, this court has held that an officer executing a search warrant for "obscene magazines" could photograph various scenes of the interior of the building he searched, including stacks of sexually explicit books and magazines, and the business license of the commercial enterprise in question. This court found that

> [t]he search warrant having been a valid one, it follows that Agent Dauwalder had the right to be in the positions which afforded him a plain view of the scenes photographed at [the] warehouse.

*United States v. Espinoza*, 641 F.2d 153, 167 (4th Cir.), *cert. denied*, 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981). Because it was well-settled that "mere evidence" may be the subject of a lawful seizure, the court reasoned that "Agent Dauwalder did not exceed the scope of the

warrant by making the photographs of what he saw in plain view and to that extent 'seizing' those views themselves as evidence." *Id.* If it was reasonable for the agent in *Espinoza* to photograph "mere evidence" in his plain view, then it was reasonable for the police officers in this case to do the same, because, like the agent in *Espinoza*, their search warrant gave them a lawful right to be on the premises.

In *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), the Supreme Court held that the mere recording of serial numbers of certain pieces of stereo equipment did not constitute a seizure because the recording "did not 'meaningfully interfere' with respondent's possessory interest in either the serial numbers or the equipment...." *Id.* at 324, 107 S.Ct. at 1152. By a parallel process of reasoning, it follows that the recording of visual images of a scene by means of photography does not amount to a seizure because it does not "meaningfully interfere" with any possessory interest. Thus, under the Supreme Court's reasoning, photographs taken by the police officers in this case would not constitute a seizure. Because the police officers in this case were properly on the Bills' premises, they could record by photography scenes presented to their plain view.[2]

On the other hand, the photographs taken by Meisling are in a different category because, as the previous discussion has concluded, Meisling was not lawfully on the premises. He had no right to the plain views he recorded by photography, and the officers had no authority to procure and permit his presence for purposes utterly unrelated to the execution of their warrant. Because Meisling is no longer a defendant in this case, we need not decide whether

---

**2.** The officer in *Hicks* entered the premises in question without a warrant but under exigent circumstances and with probable cause to believe an armed man and weapons might be found therein. He recorded the numbers from stereo equipment which, because of its high quality, appeared to be out of place in the shabby apartment. Thus, his making a record of the identification of the stereo equipment was unrelated to the purposes for which he originally entered the apartment. It thus appears that the property of which a record is made, by notation or photograph, need not be related to the purpose that authorized the initial entry onto the premises.

Meisling's photography was an unconstitutional seizure.

### E.

■ Plaintiff next argues that the district court erred in granting summary judgment in favor of all the municipal defendants in this case. Plaintiff contends that constitutionally unreasonable activities of the police officers were the result of the policies or customs of the local governments and that those governments not only failed to train their police officers but that they were deliberately indifferent to the inadequate state of the training. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

The district court held that plaintiff had failed to present any evidence that police officers were inadequately trained or that the municipal defendants were deliberately indifferent to the alleged state of inadequate training. Indeed, there is no proof in the record to support such an allegation. Neither is there any proof in the record concerning the existence of municipal policies or customs that might have resulted in the alleged unconstitutional conduct in this case. Instead, plaintiff merely argues that, because Sergeant Aseltine and Chief Larry Owen were officers of some seniority within their police departments, they must be responsible for policy and, therefore, the municipalities have such policies.

This is mere argument, not evidence. Facts may be established by inference, but the inferences must be reasonable ones, and those urged upon this court by plaintiff amount only to the kind of "merely colorable" evidence that will not withstand a well-supported motion for summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (1986). Moreover, as the Supreme Court has stated,

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* [*v. Department of Social Services*, 436 U.S. 658, 98 S.Ct.

2018, 56 L.Ed.2d 611 (1978)], unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved.

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Plaintiff offers nothing more than the inference she draws from a single, allegedly unconstitutional action. This is not sufficient to fix liability on the municipal defendants.

### F.

■ Finally, plaintiff argues that the district court improperly dismissed her state law claim for violations of the Michigan Constitution. The district court dismissed those claims because it found that "plaintiff's state law claims of violation of her right to privacy under the Michigan constitution and civil trespass, rest on her claims of illegal search and seizure." J.A. 36. Because the district court found no illegal search or seizure under the Fourth Amendment, it dismissed all pendent state claims, including the state constitutional claim. *Webb v. McCullough*, 828 F.2d 1151, 1160 (6th Cir.1987). However, because plaintiff does have a federal cause of action against one or more of the police officers who were on her premises on August 20, 1987, for violation of her Fourth Amendment rights, the district court's rationale fails and the state constitutional claim must be considered.[3]

### G.

Plaintiff has not appealed the district court's dismissal of her pendent state law claims for trespass and the intentional or negligent infliction of emotional distress. Therefore, the district court's action in that regard is not before this court.

---

**3.** Michigan recognizes a cause of action against state and local officials for violations of the state constitution. *Smith v. Dep't of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987)

*aff'd,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Marlin v. City of Detroit*, 177 Mich.App. 108, 441 N.W.2d 45 (1989).

III.

For the foregoing reasons, the district court's grant of summary judgment on the issue of the constitutionality of the search on August 20, 1987, is REVERSED because genuine issues of material fact exist concerning the reasonableness of the conduct of the police in inviting a private citizen into the dwelling of another for purposes unrelated to the execution of the search warrant. However, the district court's grant of summary judgment in favor of Trooper Seering is AFFIRMED on the ground that Seering is entitled to qualified immunity under the facts of this case. The district court is also AFFIRMED as to its ruling that photographs taken at plaintiff's home by police officers were properly made. Similarly, the district court's dismissal of the defendant municipalities is AFFIRMED because there is no evidence in the record to show that the police officers were following a municipal policy or custom when they invited Meisling to attend the search on August 20, 1987, nor is there any evidence to show that the police officers in question were untrained or that the municipalities were deliberately indifferent to the constitutional rights of their citizens.

Finally, the district court's dismissal of plaintiff's pendent state constitutional claim is REVERSED. Because we decide that plaintiff may maintain an action based on the theory that her constitutional rights were violated, the district court's rationale for dismissing the plaintiff's state constitutional claim fails.