Order granting rehearing en banc filed 7/30/97;
published opininion of 4/11/97 is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARLES H. WILSON; GERALDINE E.
WILSON; RAQUEL WILSON, next
friend/mother of Valencia Snowden,
a minor,
Plaintiffs-Appellees,

v.

HARRY LAYNE, Deputy, United
States Marshal, Supervisor for the
Washington Area, Operation
Gunsmoke; JOSEPH L. PERKINS;
JAMES A. OLIVO,                                          No. 96-1185
Defendants-Appellants,

and

RAYMOND M. KIGHT, Sheriff,
Montgomery County, Maryland;
JOHN DOE, Unknown Sheriff's
Deputies; JOHN DOE, Unknown U.S.
Marshals; UNITED STATES OF
AMERICA; ERIC E. RUNION; MARK A.
COLLINS; BRIAN E. ROYNESTAD,
Defendants.

CHARLES H. WILSON; GERALDINE E. WILSON; RAQUEL WILSON, next friend/mother of Valencia Snowden, a minor,
Plaintiffs-Appellees,

v.

MARK A. COLLINS; ERIC E. RUNION; BRIAN E. ROYNESTAD,
Defendants-Appellants,

and

No. 96-1188

RAYMOND M. KIGHT, Sheriff, Montgomery County, Maryland; JOHN DOE, Unknown Sheriff's Deputies; HARRY LAYNE, Deputy, United States Marshal, Supervisor for the Washington Area, Operation Gunsmoke; JOHN DOE, Unknown U.S. Marshals; UNITED STATES OF AMERICA; JOSEPH L. PERKINS; JAMES A. OLIVO,
Defendants.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, District Judge. (CA-94-1718-PJM)

Argued: January 30, 1997

Decided: April 11, 1997

Before RUSSELL and WILKINS, Circuit Judges, and HERLONG, United States District Judge for the District of South Carolina, sitting by designation.

_____

2

Reversed by published opinion. Judge Wilkins wrote the majority opinion, in which Judge Herlong joined. Judge Russell wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Richard Adams Cordray, Grove City, Ohio, for Appellants. James Stephen Felt, STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Stuart M. Nathan, John B. Howard, Jr., OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants Collins, Runion, and Roynestad. David H. Coburn, STEPTOE & JOHNSON, L.L.P., Washington, D.C.; Richard Seligman, Washington, D.C.; Arthur B. Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C., for Appellees.

_____

**OPINION**

WILKINS, Circuit Judge:

Charles H. Wilson and Geraldine E. Wilson (the Wilsons)[1] brought this action against federal and state law enforcement officers and others not pertinent to this appeal. The Wilsons allege that their Fourth and Fourteenth Amendment rights were violated when officers entered their home and sought to execute an arrest warrant for their son. See 42 U.S.C.A. § 1983 (West 1994); Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395-97 (1971). The district court granted summary judgment in part in favor of the officers, but refused to do so on the Wilsons' claim that the officers violated the Fourth Amendment by permitting two newspaper reporters to accompany them into the Wilsons' home and photograph

_____

[1] Raquel Wilson joined the Wilsons as a plaintiff in this action on behalf of her daughter Valencia Snowden, the Wilson's grandchild who was present during a portion of the actions that form the basis of this lawsuit. For ease of reference, however, we refer only to the Wilsons as prosecuting this litigation.

3

the officers' attempt to execute the arrest warrant. The officers appeal from the decision of the district court denying them qualified immunity with respect to this claim. We reverse.

I.

The material facts are not disputed. On April 14, 1992, federal and state law enforcement agents were engaged in a joint effort to apprehend fugitives with a history of armed, violent, criminal conduct. A team composed of Joseph L. Perkins and James A. Olivo of the United States Marshals Service and Mark A. Collins, Brian E. Roynestad, and Eric E. Runion of the Montgomery County, Maryland Sheriff's Department was formed to execute an outstanding arrest warrant. The warrant stated:

> THE STATE OF MARYLAND, TO ANY DULY AUTHORIZED PEACE OFFICER, GREETINGS: YOU ARE HEREBY COMMANDED TO TAKE DOMINIC JEROME WILSON IF HE/SHE BE FOUND IN YOUR BAILIWICK
> . . . .

J.A. 124. In addition, two newspaper reporters, one outfitted with a stillshot camera, were to accompany the officers to observe and chronicle the execution of the warrant. The reporters' participation was part of a two-week, news-gathering investigation by the newspaper; it was not designed to serve any legitimate law enforcement purpose.

During the early morning hours, the officers proceeded to the address listed in police reports, as well as probation and court records, as the fugitive's home. Upon entering the residence, the officers encountered a man dressed only in undergarments who was very angry because of the intrusion. The confrontation between the man and the officers ultimately resulted in the officers subduing the man on the floor. In the meantime, a woman dressed in a sheer nightgown emerged from the back of the house. These two individuals were later identified as the Wilsons. The subject of the warrant, the Wilsons'

4

son, was not present. Throughout these events, the reporters observed and photographed what transpired.[2]

The Wilsons subsequently brought this action against the federal and state officers who comprised the arrest team that entered their home, the team's supervisor, Harry Layne, and others not pertinent to this appeal. The Wilsons asserted that their constitutional rights under the Fourth and Fourteenth Amendments were violated by the officers' actions in three ways: (1) the officers used excessive force in attempting to execute the arrest warrant; (2) the officers lacked probable cause to believe that the fugitive would be found at the Wilsons' home; and (3) the officers permitted representatives of the media to enter the Wilsons' home to observe and photograph the execution of the arrest warrant. Ruling on the officers' motion for summary judgment, the district court dismissed the allegations of use of excessive force and lack of probable cause, concluding that the evidence viewed in the light most favorable to the Wilsons demonstrated that the amount of force the officers employed was reasonable and that the officers possessed probable cause to believe that the fugitive they sought would be found at the Wilsons' home. However, the district court rejected the officers' assertions that allowing the reporters to enter the Wilsons' home without their consent did not violate their constitutional rights. Furthermore, the district court refused to accept the officers' alternative argument that, at a minimum, they were entitled to qualified immunity because in April 1992, the law was not clearly established that permitting members of the media to accompany law enforcement officers into a private residence during the execution of an arrest warrant was unconstitutional. The officers appeal this latter ruling.[3]

_____

[2] These photographs have never been published.

[3] The district court denied the Wilsons' request to certify for immediate appeal its rulings with respect to the allegations of use of excessive force and lack of probable cause to permit those issues to be considered in conjunction with the appeal of the question of the officers' entitlement to qualified immunity. As a result, the only issue pending before us is the qualified immunity inquiry. And, because the facts are undisputed, this question presents a purely legal inquiry into whether the law was clearly established when the underlying events occurred. Thus, we may properly consider this appeal. See Johnson v. Jones, 115 S. Ct. 2151, 2159 (1995); Winfield v. Bass, 106 F.3d 525, 528-30 (4th Cir. 1997) (en banc).

5

II.

A.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." E.g., Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct. Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996). The court then must consider whether, at the time of the claimed violation, this right was clearly established and "`whether a reasonable person in the official's position would have known that his conduct would violate that right.'" Id. (quoting Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir. 1992)).

The constitutional right that the Wilsons claim the officers violated, defined at the appropriate level of specificity, is their Fourth Amendment right to avoid unreasonable searches or seizures resulting from the officers' decision to permit members of the media, who were not authorized to execute the warrant and were not present to aid law enforcement efforts, to enter into a private residence, without the homeowners' consent, to observe and photograph the execution of an arrest warrant. The question before us, then, is whether in April 1992 this right was clearly established and whether a reasonable officer would have understood that the conduct at issue violated it.

B.

Early cases considering the constitutionality of law enforcement officers allowing members of the media to enter a private residence to observe or record the execution of a warrant are scarce. But, the few decisions that we have located on this issue are uniform in concluding that such conduct does not violate constitutional principles. See Moncrief v. Hanton, 10 Media L. Rep. (BNA) 1620, 1621-22 (N.D. Ohio Jan. 6, 1984) (rejecting argument that police violated the Fourth Amendment by permitting media to enter home and film arrest

6

on the basis that no protected privacy interest was violated); <u>Higbee v. Times-Advocate</u>, 5 Media L. Rep. (BNA) 2372, 2372-73 (S.D. Cal. Jan. 9, 1980) (declining to accept plaintiff's assertion that officers violated his constitutional rights by inviting the press to be present during the execution of a search warrant at his residence); <u>Prahl v. Brosamle</u>, 295 N.W.2d 768, 774 (Wis. Ct. App. 1980) (rejecting claim that officers infringed the Fourth Amendment by allowing a television reporter to enter plaintiff's property and film search, reasoning "that the filming and television broadcast of a reasonable search and seizure, without more, [do not] result in unreasonableness").

Subsequently, in <u>Bills v. Aseltine</u>, 958 F.2d 697 (6th Cir. 1992), which was decided approximately one month prior to the incident under review, the court held that law enforcement officers may violate the Fourth Amendment by permitting a security guard to accompany them into a private residence to execute a search warrant and to engage in a search for items that were not described in the warrant. <u>Id.</u> at 701-05. The court explained:

> [W]here an intrusion is justified, whether by warrant or by probable cause and exigent circumstances, police are temporarily placed in control of the premises and its occupants. It is as though the premises were given to the officers in trust for such time as may be required to execute their search in safety and then depart. Officers in unquestioned command of a dwelling may violate that trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises. The warrant in this case implicitly authorized the police officers to control and secure the premises during their search . . . . It did not implicitly authorize them to invite a private security officer to tour plaintiff's home for the purpose of finding[evidence not specified in the search warrant] . . . .

<u>Id.</u> at 704-05 (internal quotation marks omitted). Based on this reasoning, the Court of Appeals for the Sixth Circuit held that the officers' conduct presented a jury question concerning whether the

7

officers had exceeded the scope of the search warrant and remanded for further proceedings. Id. at 705.

Such was the state of the law in April 1992 when the events underlying this litigation occurred. No court had held unconstitutional conduct similar to that in which the officers here engaged, and in fact those courts addressing the constitutionality of similar conduct had expressly upheld it. Moreover, the only court to have found a constitutional problem with a third party accompanying officers to execute a warrant had done so under circumstances in which the officers had exceeded the scope of the warrant by allowing the third party to undertake an independent search for items that were not specified in the warrant--circumstances remarkably unlike those presented by this action.

Subsequent to the events underlying this action, the Court of Appeals for the Second Circuit addressed exactly the question presented here in Ayeni v. Mottola, 35 F.3d 680 (2d Cir. 1994), and held that it was clearly established in March 1992 that officers violated the Fourth Amendment when they permitted a television crew to enter a private residence and film the execution of a search warrant that provided no authorization for their presence. Id. at 684-86. The court reasoned that although there were no decisions expressly holding that searching agents violate the Constitution by bringing members of the press into a home to observe and report on their activities, it had

> long been established that the objectives of the Fourth Amendment are to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties and that, in the normal situations where warrants are required, law enforcement officers' invasion of the privacy of a home must be grounded on either the express terms of a warrant or the implied authority to take reasonable law enforcement actions related to the execution of the warrant. [The defendant officer] exceeded well-established principles when he brought into the Ayeni home persons who were neither authorized by the warrant to be there nor serving any legitimate law enforcement purpose by being there.

8

Id. at 686. Furthermore, the court held that an objectively reasonable officer could not have failed to appreciate "that inviting a television crew--or any third party not providing assistance to law enforcement --to participate in a search was [not] in accordance with Fourth Amendment requirements." Id.

The Court of Appeals for the Eighth Circuit, however, on materi- ally identical facts, reached the opposite conclusion in Parker v. Boyer, 93 F.3d 445 (8th Cir. 1996), cert. denied, 117 S. Ct. 1081 (1997), also decided after the events relevant to this litigation. Rely- ing on the dearth of authority holding the conduct in question to be violative of the Fourth Amendment, the existence of decisions hold- ing that these types of actions by law enforcement officers did not transgress constitutional principles, and the lack of Supreme Court direction on the question, the Parker court held that officers were entitled to qualified immunity. Id. at 447. We agree.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only for "trans- gressing bright lines." See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Thus, although the exact conduct at issue need not have been held to be unlawful in order for the law governing an offi- cer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. See Anderson v. Creighton, 483 U.S. 635, 640 (1987). When these officers acted, however, the smidgen of case law that had considered the constitu- tionality of permitting the media to accompany officers into a private residence while they executed a warrant had found no constitutional infirmity with the practice.[4] Further, we cannot agree with the Court

_____

[4] In support of their contention that the law was clearly established, the Wilsons also rely on Houchins v. KQED, Inc., 438 U.S. 1 (1978). This case is inapposite. In Houchins, the Supreme Court considered whether First Amendment rights asserted by a television station were violated by prohibiting representatives of the station from filming inside a prison. A plurality of the Court--in a footnote to a recitation of the explanations offered by prison officials for preventing the filming, one of which was that it would infringe on inmate privacy--wrote that inmates "retain cer-

9

of Appeals for the Second Circuit that simply because the objective of the Fourth Amendment is to preserve privacy in the home to the greatest extent possible consistent with reasonable law enforcement efforts, the unlawfulness of the officers' conduct must have been apparent. See DiMeglio v. Haines, 45 F.3d 790, 803-04 (4th Cir. 1995) (explaining the importance of examining the law at the appropriate level of particularity to decide whether it is clearly established to such an extent that a reasonable officer would understand the illegality of the conduct at issue).

We stress that we are not called upon to determine whether the officers' conduct was constitutional or appropriate, only whether the legal landscape when these events occurred was sufficiently developed that it would have been obvious to reasonable officers that the actions at issue were violative of the Fourth Amendment. Because in April 1992 it was not clearly established that permitting media representatives to accompany law enforcement officers into a private residence to observe and photograph their attempt to execute a warrant would violate the homeowner's constitutional rights, we hold that these officers are entitled to qualified immunity.**5** Consequently, we

_____

tain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however `educational' the process may be for others." Id. at 5 n.2. This footnote provides no support for the existence of a clearly established Fourth Amendment right prohibiting a law enforcement officer from permitting a member of the media to accompany him into a private residence during the execution of an arrest warrant.

**5** Our decision in Buonocore v. Harris, 65 F.3d 347 (4th Cir. 1995), does not dictate a contrary result. The facts underlying Buonocore were essentially identical to those at issue in Bills: Officers allowed a security guard to enter a private residence and conduct a search for property not authorized by a warrant. In the appeal from the denial of summary judgment to the officers, we characterized the issue presented as whether it was clearly established on November 24, 1992 that "Fourth Amendment law prohibited government agents from bringing a private citizen into Buonocore's home to conduct an independent, general search for items not identified in any warrant." Id. at 353 (internal quotation marks omitted). And, we held that it was, reasoning:

10

reverse the decision of the district court refusing to grant summary judgment in favor of the officers.

REVERSED

RUSSELL, Circuit Judge, dissenting:

I cannot agree with the majority's disposition that the officers have not violated clearly established law. The Fourth Amendment prohibits "unreasonable searches and seizures." It is not reasonable for officers to invite reporters into a private home while they execute an arrest

_____

> [W]e have no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not reasonable. It obviously exceeds the scope of the required specific warrant and furthermore violates the sanctity of private dwellings.

Id. at 356 (internal quotation marks omitted). Buonocore, therefore, addressed the question of whether a third party, who is not authorized by the warrant to conduct a search, may accompany law enforcement officers in executing a warrant and undertake an independent search for items not described in the warrant--an issue much different than the one presented to us.

Here, the Wilsons agree that the reporters who accompanied the officers into their home did not engage in a search of, or intrude into, any areas of their home into which the officers would not have been permitted to go. Moreover, the Supreme Court has indicated that a seizure only occurs when there has been a "meaningful interference with an individual's possessory interests in . . . property"--a circumstance not alleged here. United States v. Jacobsen, 466 U.S. 109, 113 (1984); see also Arizona v. Hicks, 480 U.S. 321, 324 (1987) (recording the serial numbers on equipment "did not meaningfully interfere with respondent's possessory interest in either the serial numbers or the equipment, and therefore did not amount to a seizure" (internal quotation marks omitted). But see Ayeni, 35 F.3d at 688. Although an application of this definition indicates that the photographic images captured by the reporters were not seized within the meaning of the Fourth Amendment, we need not decide this issue because, at a minimum, it was not clearly established that it was.

11

warrant. In this case, the act of bringing reporters into the Wilsons' home, and allowing them to take photographs and remain in the home, was particularly unreasonable. The officers clearly had the wrong man, and the reporters, complete strangers to the Wilsons, photographed them in embarrassing states of undress.

At 6:45 in the morning, plainclothes officers entered the Wilsons' home while Mr. and Mrs. Wilson were lying in bed. Hearing a commotion, Mr. Wilson, wearing only his undershorts, got up to investigate, and encountered a number of plainclothes officers with guns in his living room. When Mrs. Wilson, wearing only a thin, sheer nightgown, came out of the bedroom, she found her husband face down on the floor with an officer holding a gun to his head.

The officers should have immediately realized that Charles Wilson was not Dominic Wilson. A photograph and description of Dominic Wilson given to the officers identified him as 27 years old, 185 pounds and clean shaven. Charles Wilson, Dominic's father, was 47, weighed 220 pounds, and wore a beard that was almost completely white. Nonetheless, Charles Wilson was kept face down on the floor for at least 10 minutes while the police determined that Dominic Wilson was not in the house.

While all this was going on, two Washington Post reporters took photographs of the scene and the interior of the Wilsons' home. The reporters, a male and a female, had entered the Wilsons' home with the officers and at their invitation.

I believe the officers acted unreasonably in this case, first by allowing the reporters into the home, and then by permitting them to take photographs of Mr. Wilson face down on the floor in his undershorts, and Mrs. Wilson in her sheer nightgown. I agree with the Second Circuit's analysis that Fourth Amendment jurisprudence long ago clearly established that police may not invite reporters into private homes when they are executing warrants if those reporters are neither "expressly nor impliedly authorized to be there." Ayeni v. Mottola, 35 F.3d 680, 686 (2d Cir. 1994). Furthermore, the majority reads our opinion in Buonocore v. Harris, 65 F.3d 347 (4th Cir. 1995), too narrowly. Although the strict holding of Buonocore addressed the issue of third parties who accompanied officers on the execution of a search

12

warrant, and then exceeded the limits of the warrant, the opinion can be fairly read to prohibit "government agents from bringing a private citizen into [the Wilsons'] home" whose presence is unrelated to the execution of the warrant. Id. at 353.

Finally, because the Supreme Court is not likely to offer guidance in this area anytime soon, see Parker v. Boyer, No. 96-883, 1997 WL 73486 (U.S. Feb. 24, 1997), denying cert. to 93 F.3d 445 (8th Cir. 1996) (no clearly established law prevented reporters from entering private home with police), I would use this opportunity to apply the analyses of Ayeni and Buonocore to these facts.

I respectfully dissent.

13